**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ISMIE MUTUAL INSURANCE COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:25-CV-745-DWD** |
| **vs.** | ) | |
| **STEVEN S. FLUHR and FREDERICK J. PEET JUNIOR,** | ) | |
| **Defendants.** | | |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

On January 16, 2026, Plaintiff, ISMIE Mutual Insurance (herein "ISMIE"), filed its Motion for Judgment on the Pleadings (Doc. 38), against Defendants Steven S. Fluhr and Frederick J. Peet Jr.,[1] seeking a declaration that it does not owe a duty to defend or indemnify Fluhr in a lawsuit brought by Defendant Peet in the Circuit County Court of St. Clair County, Illinois (herein "Underlying Action"). Defendant Fluhr filed his Response. (Doc. 49). Then on July 30, 2026, Plaintiff filed its Motion for Summary Judgment. (Doc. 52). While the Motion for Judgment on the Pleadings was filed first, resolution of the Motion for Summary Judgment is appropriate.

The question presented here is: Does there exist an issue of material fact as to whether there were any facts or circumstances of which Fluhr had knowledge as of the

[1] The Clerk entered a default (Doc. 46) against Defendant Frederick J. Peet, Jr. on Plaintiffs Motion for Entry of Default (Doc. 45). Pending at this time is Plaintiff's Motion for Default Judgment as to Defendant Peet (Doc. 51) which is addressed below.

effective date of the policy and which could reasonably have been expected to give rise to a claim?

For the reasons detailed below, the Motion will be DENIED**.**

## BACKGROUND

### I. THE DIVORCE MATTER

The underlying action arises out of facts not largely in dispute. Peet filed a divorce action in St. Clair County Circuit Court against his then wife, Rita Peet. Defendant claimed that Rita Peet had dissipated approximately $477,000 and some retirement proceeds. The matter was set for trial to take place on August 14, 2023. However, Defendant Peet did not appear for trial. Specifically, he did timely arrive at the St. Clair County Courthouse but did not appear in the correct courtroom. Fluhr, due to illness, arrived 20 minutes late when the trial was already underway, and the trial was conducted in the absence of Defendant Peet.

Peet relates that he had a conversation with Fluhr the day after the trial during which Fluhr outlined what took place at the August 14, 2023, trial in Peet's absence. Then on August 23, 2023, Peet sent to Fluhr a two-page facsimile in which he outlines his version of the events of August 14, 2023, and asked Fluhr to "request to set aside [the] judgment in the case of Peet versus Peet scheduled for August 14, 2023." (Doc. 4-2 and Doc. 18, ¶1) On the coversheet of the facsimile, it was written: "This needs to be filed with the court so something can get done. " (*Id.*).

On August 28, 2023, the trial judge entered judgment in the divorce matter and indicated "the Court finds no evidence was presented in favor of [Peet's] Petition for Dissipation that was filed December 12, 2018, as [Peet] failed to appear. Accordingly, the Court denies the Petition for Dissipation." (Doc. 31-4).

Fluhr reports in his affidavit that, though there was no animosity demonstrated by Peet, he nevertheless wrote Peet the following day indicating his intention to withdraw as his Counsel in the divorce action. On August 30, 2023, Fluhr filed his Motion to Withdraw as Peet's Counsel in the divorce action. Peet hired new counsel who filed on his behalf a motion to set aside the judgment on July 27, 2023. (Doc. 31-8) In that motion the new counsel alleges that Peet "has been prejudiced by the entry of the Judgment without having the ability to present evidence and testimony, due to the lack of communication from Counsel". (*Id.*). That motion was denied on December 6, 2023. (Doc. 31-1).

## II. The Underlying Action for Professional Negligence

Peet filed his lawsuit against Fluhr on December 4, 2024, claiming that Fluhr: (1) failed to properly notify him as to the time and whereabouts of the trial; (2) failed to timely appear himself; (3) failed to present evidence on behalf of his client; (4) failed to conduct adequate discovery; and (5) failed to properly protect his interest in the action. (Doc. 31-1, pg. 3). Peet further alleges that, but for the negligence of Fluhr, he would not have received the adverse divorce judgment against him. (*Id.*)

III. THE 2023-2024 POLICY ISSUED BY ISMIE

By letter dated September 26, 2023, a broker for Plaintiff sent to Fluhr the recently issued liability policy underwritten by ISMIE. (Doc. 1-3) That policy covered the period of October 2, 2023, to October 2, 2024 (herein "2023-2024 Policy"). (Doc. 31-6, pg. 4)[2]. The application that precipitated the issuance of 2023-2024 Policy does not reflect the existence of a potential claim associated with Peet. [3] The application does ask, however, whether any of the firm attorneys or staff have "become aware of any act, error or omission or fee dispute which might become the basis of a claim against the firm or its personnel?", to which Fluhr responded by checking the box adjacent to the word "No". The application for the 2023-2024 Policy was signed on September 25, 2023, approximately 6 weeks following the August 14, 2023, divorce trial. (Doc. 4-3, p. 25).

In contrast, as part of his application for renewal coverage for the 2024 - 2025 year, Fluhr submitted an undated Claim Supplement that does contain a reference to Peet and adds a handwritten note: "* the attorney is not aware of any error. However, Mr. Peet has a history of suing his lawyers (not this firm). He (the client) failed to appear at trial. This matter is being reported out of an abundance of caution." (Doc. 31-9)

Central to the motions presented here is Exclusion L contained in the 2023-2024 Policy. Exclusion L provides: "This policy does not apply to any **Claim** based upon or

---

[2] Fluhr points to the existence of a similar Professional Liability Insurance policy that was issued by ISMIE for the period of October 2, 2024 to September 30, 2025 ("2024 Policy")( Doc. 49, pg. 5) It does not appear that Fluhr provided that policy with his opposition filings or otherwise made it a part of the record. Nevertheless, that Policy is addressed later in this Order.

[3] The application does reference the existence of a "bar complaint" from what appears not to be Peet. (Doc. 31-6, p, 25)

arising out of . . . any facts or circumstances of which any **Insured** had knowledge as of the effective date of this policy and which could reasonably be expected to give rise to a **Claim**." (Doc. 4-3, p. 12-13).

The 2023-2024 Policy outlines under the heading "General Conditions" the requirement of giving notice of potential claims:

> If during the **Policy Period**, the **Insured** becomes aware of any facts or circumstances that may reasonably be expected to give rise to a **Claim**, and written notice is given to the **Insurer** as soon as practicable but in no event later than the last day of the **Policy Period** of:
>
> (a) such facts or circumstances, as well as reasons for anticipating a **Claim**
> (b) specific information as to the expected negligent act, error or omission, **Personal Injury or Advertising Liability**;
> (c) dates and details of the parties involved; and
> (d) the possible damages;
>
> then any **Claim** or coverage under this policy arising out of such specific facts or circumstances that is subsequently made against the **Insured**s and reported to the **Insurer** shall be deemed first made during the **Policy Period** as of the date of such notice.

(Doc. 31-6, pg. 14).

## IV. Preliminary Matters

### a. Choice of Law

ISMIE contends that Illinois law is applicable to any contract dispute in the instant case. (Doc. 39, pg. 16). While Fluhr cites to several Missouri cases, he does not develop any argument that Missouri law should be applied, nor does he point to any conflicts between the States' laws at issue. (Doc. 49).[4] ISMIE says it doesn't matter because both Missouri and Illinois address issues of liability policy construction similarly. In the end,

[4] The Seventh Circuit has "repeatedly recognized that perfunctory and undeveloped arguments, that are not supported by pertinent authority, are waived." *Davis v. Carter*, 452 F.3d 686, 691–92 (C.A.7 (Ill.), 2006)

it favors Illinois law, despite that the policy was issued in Missouri, because both the Underlying Action and the divorce case have Illinois roots as each originated out of St. Clair County, Illinois. A federal court "exercising its diversity jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) (citation modified). Under Illinois "choice-of-law rules, forum law is applied unless an actual conflict with another state's law is shown." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021). There being no substantive argument regarding or demonstrated conflict of law between the two states, Illinois' law is appropriately applied here.

Of course, Illinois law, not unlike Missouri law, dictates that a court is to give effect to the intention of parties as expressed in the policy language; if a policy provision is unambiguous, "it will be applied as written unless it contravenes public policy." *Hobbs v. Hartford Ins. Co. of Midwest*, 823 N.E.2d 561, 564 (Ill. 2005); *cf. BITCO Gen. Ins. Corp. v. Smith*, 89 F.4th 643, 646 (8th Cir. 2023) ("Generally, [Missouri] courts should interpret an insurance policy according to the policy's plain meaning, enforcing unambiguous language as written"). Here, neither party argues ambiguity in the relevant terms of the policy.

## DISCUSSION

### I. LEGAL STANDARD

Federal Rules of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R.

Civ. P. 12(c). When a Rule 12(c) motion is made, judgment on the pleadings is proper where no disputed issue of material fact remains and "that he or she is entitled to judgment as a matter of law." *Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987). When a Rule 12(c) motion attempts to resolve a case "on the basis of the underlying substantive merits," courts apply the summary judgment standard and consider only the contents of the pleadings. *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993); *accord Wolf v. Riverport Ins. Co.*, 132 F.4th 515, 518 (7th Cir. 2025).

Courts should grant judgment on the pleadings where there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts and inferences drawn from the pleadings' allegations are to be viewed in the light most favorable to the non-moving party. *Alexander*, 994 F.2d at 336.

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation modified). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-

moving party. *Apex Digit., Inc. v. Sears, Roebuck & Co.,* 735 F.3d 962, 965 (7th Cir. 2013) (citation modified). "Proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment." *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 512 (7th Cir. 2022).

## II. PLAINTIFF'S MOTIONS UNDER FRCP 12(C) AND FRCP 56

Before the Court could rule on ISMIE's Motion for Judgment on the Pleadings under Rule 12(c), ISMIE filed its Motion for Summary Judgment under Rule 56. While the filing of a summary judgment motion does not automatically moot a formerly filed Rule 12(c) motion, there is a procedural interplay. "It is true that duty-to-defend questions in insurance-coverage disputes can sometimes be resolved at the pleadings stage on a Rule 12(c) motion for judgment on the pleadings. But not always." *General Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 378 (7th Cir. 2011) (citation modified). Rule 12(c) motions are narrower in scope in the sense that only documents attached to the pleadings and facts not in dispute may be considered. If a party introduces or the court considers evidence outside of the record, the matter is converted to a summary judgment motion. "Although a court usually may not consider materials outside the pleadings on a Rule 12(c) motion without treating the motion as one for summary judgment, an exception exists when a concededly authentic document is referred to in a complaint and is central to the plaintiff's claim" *Gillis v. Meisner*, 525 F. App'x 506, 508–09 (7th Cir. 2013) (citation modified); *e.g., R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union* 150, 335 F.3d 643, 647 (7th Cir. 2003).

Here, Plaintiff attached several documents to both its initial Complaint (Doc. 4) and its Amended Complaint. (Doc. 31). In both filings, Plaintiff provided the underlying complaint, Peet's facsimile of August 23, 2024, letter to Fluhr, the 2023 Policy, and claim supplement. (Doc. 4). Plaintiff added additional exhibits to its Amended Complaint, namely: the judgment of dissolution of marriage, Fluhr's Motion to Withdraw, the 2023 Policy and Application, Substitution of divorce counsel, Motion to Set Aside Divorce Judgment. (Doc. 31). ISMIE also attached to its Motion for Summary Judgment Memorandum its Requests for Admissions and Fluhr's Responses. (Doc. 53). For Fluhr's part he only filed as exhibits to his Response in Opposition to Plaintiff's Motion for Summary Judgment his Affidavit and Discovery Deposition excerpt of Peet of May 6, 2026. (Doc. 55). The Court believes that it could consider all of ISMIE's attachments on the 12(c) motion as they are seemingly centrally associated with the subject of the controversy. Nevertheless, given that additional documents were attached as exhibits relative to the summary judgment motion and response, further consideration of the 12(c) motion is unnecessary, and the Court will consider the Motion for Judgment on the Pleadings (Doc. 38) moot.[5] The Court now turns to the Motion for Summary Judgment.

## III. Whether Fluhr was Objectively aware of a potential claim from Peet

The 2023-2024 Policy is a "claims made" policy meaning that both the claim and the reporting of the claim, must occur in the same policy period or on or after any extended reporting period, such as a prior acts date, which here is October 2, 1994. (Doc.

[5] The Court, prior to the filing of the Motion for Summary Judgment (Doc. 52) had considered Plaintiff's Motion for Judgment on the Pleadings. Based on the record, the Court would have denied latter motion as well.

31-6, pgs. 4-5). Coverage for professional negligent acts is available to Fluhr only if he fulfills his claim reporting obligations: if he "becomes aware of any facts or circumstances that may reasonably be expected to give rise to a Claim," he must ensure "written notice is given to the Insurer as soon as practicable but in no event later than the last day of the Policy Period." (Doc. 31-6, pg. 14). Additionally, the "L" Exclusion will bar coverage of "any claim based upon or arising out of any facts or circumstances of which any insured had knowledge as of the effective date of this policy and which could reasonably have been expected to give rise to a claim." (Doc. 31-6, pg. 13).

ISMIE argues that the undisputed facts as pled in the Underlying Action as described in the documents attached to the Complaint in this matter (Doc. 4); as addressed by its Statement of Undisputed Material Facts (Doc. 53, pgs. 5-14) and admitted to by Fluhr (Doc. 55, at 2-3); and Fluhr's responses to Plaintiff's First Set of Requests for Admissions (Doc. 53-2) show that coverage under the Policy is precluded by Exclusion L. (Doc. 39, pgs. 17-18). Certainly, ISMIE may arguably refuse to defend and indemnify Fluhr if Exclusion L applies. In making the determination whether Fluhr fulfilled his reporting obligations or whether Exclusion L applies, the Court should look to the information and knowledge known by him at the time in 2023 when he made application for the 2023-2024 policy. The Court must then determine whether the facts known to him might reasonably result in a claim. *See IMEG Corp. v. Atl. Specialty Ins. Co.*, No. 20-CV-03316, 2025 WL 962961, at *12 (N.D. Ill. Mar. 31, 2025) ("an objective standard should apply in determining whether the insured party had a basis to believe that his wrongful acts might result in a claim.") (citing *Smith v. Neumann*¸ 682 N.E.2d 1245, 1254

(Ill. App. Ct. 1997)) (citation modified). *See Darwin Nat'l Assur. Co. v. Hellyer*, No. 10 C 50224, 2011 WL 2259801, at *3 n. 3 (N.D. Ill. June 7, 2011) ("Prior Knowledge Condition[s] require[] the court to apply an objective, reasonable person standard to the facts and circumstances that were subjectively known to the insured in order to determine whether there was 'any basis' . . . to foresee a claim being made against [the insured].").

By the terms of the policy, the question of whether Fluhr fulfilled his reporting obligations and whether any failure to do so effectively excludes coverage necessarily entails consideration of both the subjective aspect of Fluhr's "knowledge" and the objective aspect of whether the facts or circumstances he had knowledge of should reasonably have alerted him to a possible claim. Therefore, the ultimate question presented is whether in August 2023 and prior to the 2023 Policy's effective date, Fluhr had knowledge of an error, act or omission on his part that might reasonably be expected to be basis of a malpractice claim by Peet.

Here, the facts ISMIE claim would lead a reasonable person to the conclusion that Peet's claim was forthcoming claim are not as determinative as ISMIE asserts. Looking at other cases that address the issue have a collection of facts and circumstances that more clearly and fully support finding that a claim was reasonably foreseeable. For example, in *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336 (7th Cir. 2013), Defendant law firm represented a potential buyer in the purchase of a Rite Aid drugstore located in Lima, Ohio. *Id.* at 338. The Buyer and Seller executed the sales contract separately. *Id.* Defendant law firm misfiled the contract executed by Buyer, however, and Seller subsequently attempted to rescind the contract—which it characterized as an

offer—because it had not timely received a copy of the contract executed by Buyer. *Id.* The next day, an associate of the defendant law firm sent the following in an email to Seller's counsel:

> I looked through all my files. It turns out the originals were placed in the wrong Rite Aid file, attached are scanned copies of the signed documents. This whole situation is my fault and not the fault of my client. I apologize for this situation. I therefore kindly request that the cancellation notice be withdrawn, and upon withdrawal, I will overnight the signed originals.

*Id.* at 339. The request was unsuccessful and the Buyer's attorney reiterated that his client was rescinding and there would be no purchase. *Id.* A lawsuit to enforce the sales agreement was filed by Seller on March 14, 2007. *Id.*

In the meantime, defendant attorney's policy of professional liability insurance was to expire on April 15, 2007. *Id.* A renewal application was submitted on March 10, 2007. *Id.* In completing that application, defendant attorney responded in the negative to the question: "Does the firm or any attorney or employee in the firm have knowledge of any incident, circumstance, act or omission, which may give rise to a claim not previously reported to us?" *Id.* A policy was then issued for the 2007-2008 period on June 12, 2007. *Id.* at 340.

The lawsuit to enforce the agreement proved to be unsuccessful on June 12, 2007, when it was dismissed for lack of jurisdiction. *Id.* Near the same time, a separate matter where Seller sought a declaration that there was no contract had been filed in Alabama. *Id.* Seller was successful and it was determined there that there had been no contract formed because it was not delivered to Seller. *Id.* In August 2007, Buyer informed the

Defendant Attorneys that he was considering a malpractice claim against the law firm. *Id.* The Buyer sent a formal notice of claim to Defendant attorneys which was immediately sent to the insurer. *Id.*

The Court found that since the claim was reported in August 2007, the 2007-2008 policy controls. *Id.* at 342. After a detailed recitation of the facts available to Defendant Attorney, the Court emphasized that on March 14, 2007, Seller filed a declaratory-judgment action in Alabama state court seeking a declaration that no contract existed. *Id.* at 343. Thereupon, the Defendant law firm "was informed of the filing and knew, beyond doubt, that Seller had no intention of honoring its agreement and that [Defendant law firm's] failure to deliver the executed contract may result in a claim against it for malpractice." *Id.* at 343.

*Koransky* provides a set of facts that would clearly suggest that a claim could reasonably arise from them. The Alabama litigation could bring about only one of two possible outcomes: Either there was an enforceable contract or there was not. Here, however, it is not so clear. The record demonstrates that Fluhr was aware that his client did not appear for trial, though undoubtedly informed of the date and location of the event. By the end of August 2023, it is clear that Peet was disappointed in the outcome. Fluhr was aware that he had a disgruntled client in Peet and immediately moved to withdraw his representation after their conversation on August 14, 2023. Whether he withdrew because of his apparent frustration with Peet and his failure to appear or that Peet threatened to sue him is not part of the record. But certainly, information regarding

what occurred in the wake of a poor result in the divorce litigation might well influence the mind of a reasonable person as to whether a claim could be forthcoming.

But not all poor results in litigation necessarily alert a lawyer to a possible claim. It is not unreasonable to estimate that a proportion nearing one-half of all litigants whose expectation of a win in Court have their hopes dashed by a judge's decision. Nor does having a client with disappointed expectations necessarily suggest that malpractice occurred or that a claim will be forthcoming. ISMIE seemingly suggests that an attorney's knowledge of the existence of a disgruntled client mandates reporting. But there is nothing ISMIE points to in the 2023-2024 Policy that supports the notion that the parties intended that the insurer must be put on notice anytime an insured's client expresses unhappiness with the outcome of his case.

Nevertheless, ISMIE makes much of Peet's two-page narrative facsimile and his expression of discontent with the trial. Indeed, Peet complained that Fluhr was late to the hearing, that Fluhr should have called Peet about being late, and that the Judge should have been stopped the trial for medical reasons and reset it. (Doc. 53, pg. 20). Certainly, criticisms of counsel's performance might suggest a heightened degree of disappointment, but here they do not rise to the level of reasonable expectation of a malpractice suit. The Court declines the invitation to adopt the position that a client's failure to appear at trial, although aware of the time and place, and a lawyer's illness during that trial, even when coupled with the result suffered, requires the conclusion that these facts could reasonably be expected to precipitate a malpractice lawsuit such that the attorney should put his insurer on notice.

Plaintiff goes further and argues that there is a nationwide consensus that "knowledge of client expressions of dissatisfaction with the insured's professional's services is unmistakably a circumstance that could reasonably give rise to a claim." (Doc. 53, pgs. 21-22). Plaintiff proffers several cases that it contends is evidence of this consensus. ISMIE first points to a Nebraska case, *Roberts v. ALPS Prop. & Cas. Ins. Co.*, 2020 WL 13566520 (D. Neb. Nov. 23,2020). On October 8, 2018, the client sent attorney an email expressing his dissatisfaction with the way his attorney represented him in his divorce. *Id.* at *2. In particular, the client complained of his attorney's failure to offer client's wife's credit-card statements at trial prevented him "from using them on appeal." *Id.* Client stated, "That mistake makes it impossible for me to recoup $63,308.31 on appeal." *Id.* Client then advised that he had "talked to [his attorney's] insurance carrier and they would like you to contact them." *Id.* He asked his attorney to advise him "of [his attorney's] course of action." *Id.* The Attorney's insurance policy was still in effect at the time he received the email from Client. *Id.* Just 10 days later, the attorney accepted the new policy at which time he signed a statement that there were no changes to be made to the application he completed on October 5, 2018. *Id.*

The District Court found that the policy required the attorney to report any claim when he "knew or reasonably should have known or foreseen" that his client's dissatisfaction might have been the basis for an insurance claim. *Id*. at *7. The Court noted that the client had placed the attorney on notice when he expressed dissatisfaction, fixed the harm at a specific amount of money, and told the attorney to contact his insurer. *Id*.

Contrary to ISMIE's assertion, *Roberts* does not stand for the proposition that mere expression of dissatisfaction is adequate notice that a malpractice claim could be made. The facts in *Roberts* and those in this case are not alike. In *Roberts*, the attorney was clearly placed on notice that he was going to be sued for professional negligence. Even before that attorney reported the claim, the client attempted to negotiate a "tolling agreement" because he would otherwise "be forced to file suit in January 2019". *Id*. at *3. Such unequivocal statements of dissatisfaction coupled with allegations of specific negligence, and clear expressions of an intent to sue, clearly would create an obligation to report a claim. In the present case, there are no specific allegations of negligence or clear expressions of an intent to sue.

ISMIE next cites to a Missouri case that originated from a divorce matter, *Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co.*, 969 S.W.2d 749 (Mo. 1998). There, Nina Herbert contacted N. Scott Rosenblum in March of 1991 concerning the dissolution of her marriage. *Id.* at 749. A short time after her initial consultation, Herbert telephoned to indicate she had been served with summons and petition for divorce filed by her husband in Bexar County, Texas. *Id.* at 750. She scheduled a meeting with Marten, an associate of Rosenblum, for April 1, 1991. *Id.* On May 6, 1991, the Circuit Court of Bexar County entered a Final Decree of Divorce against Herbert by default. *Id.* Herbert received a copy of the decree on May 13, 1991. *Id.* She immediately telephoned the law firm. *Id.* Marten contacted the court to confirm the entry of the decree and began to look for a Texas attorney in case further proceedings were necessary. *Id.* In support of the motion, Marten executed an affidavit on May 29, 1991, that stated the default was entered "due

to my excusable neglect or mistake". *Id.* The law firm paid the Texas attorney's fees. *Id.* Rosenblum did not believe that Herbert should have to pay this expense because "it wasn't her fault that the default was entered." *Id.*

Herbert was dissatisfied with her attorney and wrote to him accordingly:

> Your negligence, not only hurt me financially, but this is the biggest insult I have ever got.
> Scott,
> You must advise me in writing, of all the options and in case one or two options fail, how you are going to take care of it. Within 7 days.
> I do not want to be brushed off any more.
> I have not received what is mine, because of your professional negligence.
> I have been going through an emotional distress because of all this.
> * * * * *
> I do understand that maybe by being busy you neglected my case. But my intentions with you were honorable from the beginning, and I expected then and expect now the same as a return from you.

*Id.*

On January 13, 1992 Herbert wrote a second letter to Rosenblum. *Id.* at 750-51. She stated: "...when I came in with my brother Paul Gismegian, you told us that you are filing for an appeal on your own expense and you will take it all the way to the Supreme Court if you have to. And when I asked you if that is not going to work, what then? You said that I would have to file a suit against you." *Id.* She then added, "I knew then and I know now that this is a very strong possibility." *Id.* at 751.

In a letter dated September 14, 1992, Rosenblum received notice that a lawyer had been retained to pursue a legal malpractice action against him. *Id.* He advised the insurer of the existence of the claim on September 16, 1992. *Id.*

In the *Herbert* case, the court focused on her complaints of being financially hurt because of the attorneys' professional negligence and indication her statement that she

that there was the strong possibility that she would have to sue the law firm. It found that "[b]ecause the law firm knew prior to the 1992/1993 policy period that an act or omission had occurred and because the firm had been informed by Ms. Herbert that she might pursue a claim regarding that event, the 1992/1993 policy provides no coverage." *Id.* at 753.

Again, there is a distinct difference in the facts of the *Herbert* case and the facts presented here. Here, there are no admissions of fault nor threats of a lawsuit. Additionally, the attempts on the part of the allegedly negligent lawyer to correct the failure to tend to the underlying divorce matter in *Herbert* suggest "actual" knowledge that an error had occurred and suit would likely follow. Not so in this case.

ISMIE next cites to *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2003) in further support of its proposition that there is a nationwide consensus. There, the attorneys were retained to represent a man against a hospital for failure to timely treat his head injury, leading him to suffer a catastrophic result. The case languished for over a decade, and it was dismissed for lack of activity. *Id.* at 304. The attorney attempted to resuscitate the medical malpractice claim without success. It was not until 2 years later that the attorney advised his client that the case had been dismissed. *Id.* at 304. In response, the client wrote the attorney expressing his dissatisfaction by indicating that "[y]ou caused continue to cause great anguish to me and my family by ignoring my case, my plight my right to expect you to abide by your contract with me, to represent me and my best interest in my case. . .." *Id.* The attorney notified his insurer five weeks later. *Id.*

But *Coregis* does not help ISMIE's case because the court there used an objective standard different than that which is properly applied here. There the court concluded "that a reasonable attorney in possession of these facts would have foreseen *that he had breached a professional duty* by failing to investigate and pursue a case against St. Mary's, and that consequently there might be a basis for a legal malpractice claim against him." *Id*. at 309 (emphasis added).[6] In any event, the facts known to the negligent lawyers and their apparent desire to keep hidden from their clients the fact of the dismissal would be enough under the current "reasonable person" objective standard.

*Int'l Surplus Lines Ins. Co. v. Mfers. & Merchs. Mut. Ins. Co.*, 661 A.2d 1192 (N.H. 1995) is the last case cited by ISMIE in support of its proposition that there is national consensus that knowledge of the dissatisfaction held by a client satisfies the objective part of the test. But it, too, is not helpful.

In December 1987, a dispute arose over the valuation of stocks at the time the Defendant company redeemed them. *Id.* at 1194. Former shareholders hired counsel who wrote to the Company's attorney in July 1988 raising concerns about asset valuation and other activities. *Id.* At a meeting in August 1988, protesting shareholders expressed grievances regarding asset valuation and referred to the Company's attorney as "inept". *Id.*

On May 3, 1989, the liability policy became effective. *Id.* It provided in part: "Exclusion (i) of the policy bars coverage for claims based on "any act, error or omission

[6] The Court colorfully noted that "[a] breach of professional duty and a basis for a claim are thus "two peas in a pod". If the former occurs, experience teaches that the latter can be expected to follow." Id at FN 3.

occurring prior to the effective date of this policy if ... the insured at the effective date of this policy knew or could have reasonably foreseen that *such act, error or omission* might be the basis for claim or suit." *Id.*(emphasis added). The defendant attorneys argued that the exclusion language was overly harsh because the word "might" was too expansive and would necessarily require reporting of any act that might be a basis of claim. *Id.* Defendant also argued there was no evidence that the claimant was at the time actually contemplating a suit. *Id.* at 1195. The Court disagreed the use of the word "might" created an ambiguity and noted that there was nothing in the policy language that required actual contemplation to trigger the requirement to notify the insurer of a claim. *Id.* The Court further found that the shareholders' complaints about the valuations were received long before the effective date of the policy. *Id.* It noted that "[i]f the shareholders' grievances had merit, the defendants' liability to the shareholders would have greatly exceeded the excess transaction costs sought from them by [the Company]. It would have been reasonable to conclude that the shareholders might bring suit to recover the money they believed the defendants owed them." *Id.*

In each of the cases cited by Plaintiffs for the nationwide consensus argument, there was not just an expression of dissatisfaction by the client, but also reference to a specific act of professional negligence. Thus, contrary to Plaintiff's argument here, the cases it cites do not demonstrate the existence of a consensus that expressions of dissatisfaction with a lawyer's services alone triggers the reporting requirement.

Next, Plaintiff asserts that "the combination of Fluhr's inability to present Peet (sic) as a witness, Peet's written of dissatisfaction with Fluhr and Fluhr's motion to withdraw

all demonstrate as a matter of law that Exclusion L applies. (Doc. 53, pg. 23). This Court disagrees. There is no apparent dispute that the policy of insurance provides coverage for the Peet's lawsuit. The dispute is regarding the application and effect, if any, of Exclusion L on coverage. "Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies." *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). ISMIE has not met that burden on either its Motion for Judgment on the Pleadings or Motion for Summary Judgment.

The Court recognizes that under the objective standard, the viability of a malpractice lawsuit is not an appropriate consideration. Still, the factual observations to assess whether a claim might be reasonably be expected are to be considered from the point of view of the attorney with the knowledge he had at the time. The facts available to Fluhr at the time are that his client did not show up for trial despite being aware of when and where the trial was to occur, and that without his testimony, his claim for dissipation was in peril; Fluhr's apparent understanding that Peet simply did not appear as instructed; that, despite the illness, Fluhr participated in the trial and achieved some level of success on other matters; that there was no animosity exhibited by Peet toward Fluhr at the time of their discussion and Peet did not complain of his conduct until the facsimile of August 23, 2023, which contained requests that Fluhr include allegations before the trial court that Fluhr knew to be untrue; that they both agreed that Peet should seek new counsel; that he believed the judgment was reasonable. (Doc. 55-1). These facts, as related and apparently known by Fluhr, cannot be ignored in the analysis nor excluded from consideration. In other words, *all* of the pertinent facts known to the insured and

not just those that the insurer highlights are an integral part of the analysis and must be considered on a summary judgment motion.

Illinois law requires that, if an exclusion in a policy is relied upon to deny coverage, as ISMIE does here, its applicability must be clear and free from doubt. *See Rogers Cartage Co. v. Travelers Indem. Co.*, 103 N.E.3d 504, 520-21 (Ill. App. Ct. 2018) (citing *Economy Preferred Ins. Co. v. Grandadam*, 656 N.E.2d 787, 789 (Ill. App. Ct. 1995)). The facts, including those provided by Fluhr, do not clearly or undoubtedly support exclusion of coverage for the claims in the Underlying Action. As such, ISMIE is not entitled to Summary Judgment and the motion will be denied.

## IV. THE 2024-2025 POLICY

The Complaint filed by ISMIE specifically addresses only the 2023-2024 policy of insurance. Defendant references but does not attach the 2024-2025 policy. ISMIE does, however, include as an exhibit to its Complaint the Claim Supplement form that was completed by Fluhr for the renewal process and eventually the issuance of the 2024-2025 policy. (Doc. 4-4). Yet, ISMIE does not limit its request for relief to the 2023-2024 policy and, instead, requests a declaration that "ISMIE is under no duty to defend or indemnify in connection with the Claim that is the Underlying Action." (*Id.*, pg.9).

Of possible consequence is that Fluhr argues in opposition to the summary judgment motion that it is the 2024-2025 policy on which "[t]he claim was made by Peet during the policy period in which Fluhr disclosed in his application the possibility of the Peet claim prior to its issuance." (Doc. 55, pg.1). He goes on to argue that if "the policy in

effect during the time suggested by plaintiff is the appropriate policy, then Fluhr's failure to disclose at the time of application does not exclude it from coverage." (*Id.*, pg.2).

In its Reply, ISMIE reiterates its arguments that it is the 2023-2024 Policy that is the operative policy and not the 2024-2025 policy as Fluhr contends; that the objective standard of analysis is appropriate; and that Fluhr's waiver and estoppel arguments fail. (Doc. 56). ISMIE supplies Additional Undisputed Material Facts as well as an affidavit of a claims manager to the effect that there had been no denial of providing a defense for Fluhr in the Underlying Action. (Doc. 56-1; 56-2). The facts presented there are clearly to rebut the arguments raised by Fluhr in his Response to the summary judgment motion.[7]

Returning to Fluhr's contention that it is the 2024-2025 policy that is operative, it is true that Illinois law treats a series of renewed insurance policies as separate and distinct policies. A recent Illinois Appellate decision, *Illinois State Bar Ass'n Mut. Ins. Co. v. Rex Carr Law Firm, LLC*, 2017 WL 2805126 (Ill. App. Ct. 2017), *appeal denied* 89 N.E. 3d 754 (Ill. 2017), is instructive. There, defendant law firm was sued at a time when what the Court labeled as "Policy 10" was in effect. *Id.* at *2. An alleged misrepresentation was made approximately 2 years prior when applying for renewed coverage under what the Court identified as "Policy 8". *Id.* The insurer sought to rescind not only Policy No. 8 but all of those subsequent policies, including Policy 10. *Id.* at *5. The insurer reasoned that,

[7] Typically "[w]here new evidence is presented in either a party's reply brief or affidavit in further support of its...motion, the district court should permit the nonmoving party to respond to the new matters prior to disposition of the motion...or else strike that new evidence." *Baugh v City of Milwaukee*, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993); *see also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F. 3d 1130, 1134 n. 1 (7th Cir. 1996) (concluding district court properly considered an affidavit "given that it was submitted in response to [the plaintiff's] arguments in her summary judgment response...which were there raised for the first time").

"in applications for policies preceding No. 10, beginning with the application [for Policy No. 8], Rex Carr made material misrepresentations . . . and if he had been honest and forthright in those early applications, plaintiff would have shunned the firm as an applicant and would not be the Firm's insurer" when sued by the former clients. *Id*. The Court disagreed with the reasoning of the insurer, pointing to both Illinois case law and the Illinois Insurance Code, specifically 215 ILCS 5/154 (West 2012).

"[I]n the eyes of the law, each renewal of an insurance policy results in a new contract, a new policy." *Id.* (citing *Dungey v. Haines & Britton, Ltd.,* 614 N.E.2d 1205, 1208 (Ill. 1993); *Doe v. Illinois State Medical Inter–Ins. Exchange*, 599 N.E.2d 983, 988 (Ill. App. Ct. 1992); *Eipert v. State Farm Mut. Auto. Ins. Co.*, 545 N.E.2d 497, 501 (Ill. App. Ct. 1989)). The Court then pointed to the Illinois Insurance Code: "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy[,] shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty[,] or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor." *Id.* (citing 215 ILCS 5/154 (West 2012)). The Court reasoned that "if, to induce the insurer to issue a policy, a proposed insured makes a material misrepresentation to the insurer, that misrepresentation will defeat or avoid the policy only if the misrepresentation is stated in the policy or in a written application for that policy ("the written application therefor")." *Id.* (citing 215 ILCS 5/154 (West 2012)). And, with important guidance for the present matter, the Court found: "It follows that if policy No. 10 is to be rescinded because of a misrepresentation in an application, the

misrepresentation has to be in the application for that particular policy, policy No. 10; misrepresentations in applications for other policies are irrelevant." *Id.*

As noted, ISMIE asserts Peet's claim does not arise under the 2024-2025 policy. However, ISMIE seeks relief from any duty it might have to defend and indemnify generally and not restricted to just the 2023-2024 policy. But there remains the question of whether those duties nevertheless exist under the 2024-2025 policy given that, in the eyes of Illinois law, a renewed policy is a new insurance contract and policy.[8] Here, the 2024-2025 policy was issued after Fluhr disclosed on his application that Peet may make a claim. It is during the term of that policy that the complaint was filed in the Underlying Action. *Rex Carr Law Firm* suggests that the duties to defendant and indemnify Fluhr may still exist such that summary judgment in favor of ISMIE should be denied.

Given the Court's ruling, there is no need to presently address Fluhr's argument regarding estoppel and waiver. (Doc. 49, p. 2)

## Conclusion

For the aforementioned reasons the Court **DENIES as Moot** ISMIE's Motion for Judgment on the Pleadings (Doc. 38) as to Count I of the Amended Complaint (Doc. 31). The Court further **DENIES** ISMIE's Motion for Summary Judgment (Doc. 52).

[8] In Illinois, renewal of an insurance policy is generally conceived to be a new contract unless it amounts to nothing more than a mere continuation. *See Bronstein v. INA Life Ins. Co. of N. Am.*, 566 N.E.2d 484, 486 (Ill. App. Ct. 1990).

**SO ORDERED.**

Dated: September 16, 2026

Judge Dugan

Digitally signed by Judge Dugan
Date: 2026.09.16 16:20:05 -05'00'

DAVID W. DUGAN
United States District Judge